UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

NO. 09-CR-00039-GFVT

UNITED STATES OF AMERICA                                                                PLAINTIFF


V.                              RECOMMENDED DISPOSITION


JIMMY DARRELL GAY                                                                       DEFENDANT

\* \* \* \* \*

The Court considers a Motion to Suppress filed by Defendant Jimmy Darrell Gay. *See* DE #12 Motion. Alleging a Fifth Amendment/*Miranda* violation, Defendant moved to suppress statements he made to law enforcement on January 29, 2009. *See id.* Relatedly, Gay also sought suppression of evidence seized per a warrant-based search of Defendant's residence, arguing lack of probable cause. *See id.* The Court held an evidentiary hearing and subsequently permitted counsel to file supplemental briefs. *See* DE #15 Minute Entry; DE #17 Defendant's Brief; DE #18 U.S. Brief. Having reviewed the briefs and arguments submitted by counsel, the Court recommends that the District Court DENY Defendant's motion to suppress. On this record, no basis for suppression exists.

**I. Background Information**

On January 29, 2009, Minor Allen of the Hazard Police Department responded to a complaint at Hazard Hospital. *See* DE #16 Transcript (hereinafter "Tr.") at 15. Specifically, a woman alleged that a man, later identified as Defendant Jimmy Darrell Gay, had used his cell phone camera to take several pictures of her juvenile son in the lobby of the hospital. *See id.* at 16. The juvenile told Allen that Gay had taken the photographs after talking to the boy about the boy's

appearance, modeling potential, and the possibility of Gay taking photographs of the boy and splitting any profits. *See id.* at 16-17. Allen testified that the boy's mother, upon hearing about the conversation and photographs, confronted Defendant about the pictures before ultimately alerting the Police Department. *See id.* at 17.

Having been given Gay's location in the hospital, Allen approached Gay and "advised him of the nature of the complaint . . . and asked him if he had been taking pictures." *See id.* at 18. Gay was at the hospital with his mother, who was a patient. *See id.* at 40. Defendant admitted to taking the photographs and, when asked, showed Allen the cell phone and the pictures saved on it. *See id.* In addition to the "eight or nine" photographs of the boy, Allen also observed several other pictures, the majority of which were males with the "same body build, same hairstyle." *See id.* at 19. None of the pictures was obscene. *See id.*; *id.* at 39. Defendant indicated to Allen that he enjoyed "collecting pictures" and that some of the photos on his phone were "pictures of a picture" taken from the Internet. *See id.* at 20; *id.* at 39 (East testifying: "There was a couple [photos] that . . . didn't look like they were from that cell phone. And I asked him, he said, Well, those were pictures of pictures from the Internet that he had got and put on his cell phone."); *see also* DVD: Jan. 29 Station Questioning (Hazard P.D. 2009), at 20:14-20:18[1] (Defendant told the officers that the images were not downloaded from the Internet; rather, he took a picture of the picture on the computer screen.).

Allen then contacted his supervisor, Captain James East, and asked him to come to the hospital. *See* DE #16 Tr., at 20; *id.* (noting that Allen contacted East because Allen was

---

[1]

The Court viewed the DVD using Windows Media Player; the time frames cited throughout this recommended disposition reflect those displayed on this computer program.

"suspicious," not because he was "concerned that a crime had been committed at that point"). East responded, looked at the photos on the cell phone, and asked if Gay would go down to the station "to try to clear up the matter a little bit more." *See id.* at 21; *id.* at 42. After some hesitation due to his mother's hospitalization, Defendant agreed to go to the station. *See id.*; *id.* at 43 (noting that Gay rode to the station in the back of a patrol unit). As Defendant was not under formal arrest, he was not handcuffed, frisked, searched, or divested of his personal possessions. *See id.* at 23-24; *id.* at 43. Additionally, the officers informed Gay that they would return him to the hospital at the conclusion of the station-house interview. *See id.* at 23.

Allen and East jointly questioned Defendant in an interrogation room at the police station. *See* DVD: Jan. 29 Station Questioning (Hazard P.D. 2009) (showing Defendant seated on a bench in the back corner of the room, Allen seated beside him with a significant amount of space separating the two men, and East seated on the other side of the table with his back to the door). At the outset, East read Gay his *Miranda* rights and sought oral and written waiver. *See* DE #16 Tr., at 45-46 (noting "standard practice" of reading rights before questioning anybody in the interview room). Defendant acknowledged that he knew his rights and "indicated that he would talk to [the officers]." However, Gay refused to waive his rights, both orally and in writing, "emphasiz[ing] . . . several times that no one could waive their rights[.]" *See id.* at 27; *id.* at 45-46. Both Allen and East signed the waiver of rights form, and East noted that Defendant refused to sign because of the stated belief that he could not waive his rights. *See id.* at 30.

During the interview, Allen and East asked questions about the incident at the hospital, the origins of the photographs saved on Gay's cell phone, Defendant's internet usage and photography interests, and a prior charge filed against Gay in the early 1990s. Later in the interview, which

3

lasted approximately two hours, *see id.* at 51, the officers sought permission to search Defendant's home and computer. *See id.* at 30-31; *id.* at 53. Gay denied such permission, citing privacy concerns. *See id.* at 53-54; DVD: Jan. 29 Station Questioning (Hazard P.D. 2009), at 25:58. Questioning later ended once Gay began having chest pains; at that time, Gay also stated that "all he had left to do now was kill his self." *See id.* at 56-57. The officers cited him as mentally ill, and Defendant was transported, via ambulance, to the hospital. *See id.* at 57. Because of the mental illness citation, Gay was placed on a "mandatory 72-hour hold." *See id.*

A state judge found probable cause for a search warrant on the basis of an affidavit detailing the hospital incident and statements made by Gay to Allen and East at the police station. *See* Search Warrant; Affidavit For Search Warrant; DE #16 Tr., at 4 (noting that United States tendered the underlying warrant and application upon the Court's request). The search yielded evidence of child pornography used to support a federal indictment charging Defendant with violations of 18 U.S.C. § 2252(a)(2) and 18 U.S.C. § 2252(a)(4)(B). *See* DE #1 Indictment, at 1-2. The indictment also includes a forfeiture count per 18 U.S.C. § 2253. *See id.* at 2.

Defendant, through counsel, filed the instant motion to suppress challenging the admissibility of Gay's statements and the warrant-based search of Gay's residence and computers. *See* DE #12. The United States opposed suppression, arguing that the station-house questioning was not custodial under *Miranda* and that the four-corners of the search warrant application contained probable cause. *See* DE #13.

**II. Statements to Police**

1. Fifth Amendment/*Miranda* Analysis

Prior to custodial interrogation, an officer must warn the individual in custody

4

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*See Miranda v. Arizona*, 86 S. Ct. 1602, 1630 (1966). Without the requisite warning, any statement made will not be admissible in a subsequent trial. *See id.* ("[U]nless and until such warnings . . . are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used[.]").

A defendant bears the burden of establishing that a scenario invoked *Miranda's* obligations. *See United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2109, 88-2135, 1989 WL 153161, *5 (6th Cir. Dec. 18, 1989); *United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006). For purposes of *Miranda*, a person is "in custody" when, under the circumstances surrounding the interrogation, the person was under "'formal arrest or [experienced] restraint on freedom of movement' of the degree associated with a formal arrest." *See California v. Beheler*, 103 S. Ct. 3517, 3520 (1983) (quoting *Oregon v. Mathiason*, 97 S. Ct. 711, 714 (1977)). When determining custody, courts evaluate the "objective circumstances of the interrogation" rather than the "subjective views harbored by either the interrogating officers or the person being questioned." *See Stansbury v. California*, 114 S. Ct. 1526, 1529 (1994); *Berkemer v. McCarty*, 104 S. Ct. 3138, 3151 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). The Sixth Circuit uses the following factors as guidance: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *See United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)).

Here, law enforcement officers questioned[2] Defendant for approximately two hours. *See* DE #16 Tr., at 51 (East testifying that interview began at 6:27 p.m. and ended when Gay began complaining of chest pains at 8:23 p.m.). This questioning occurred at the police station in a small room, with the officers seated between Gay and the door. These factors weigh in favor of a custody finding but are not dispositive. *See, e.g., Mathiason*, 97 S. Ct. at 714 (finding that station-house questioning was noncustodial where the defendant "came voluntarily to the police station . . . [and] was immediately informed that he was not under arrest"); *Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003) (affirming a state court finding of noncustodial questioning where defendant voluntarily came to the police station, was informed "repeatedly" that he was free to leave at any time, was not formally under arrest, and voluntarily agreed to answer officer's questions); *United States v. Gleaton*, No. 09-20136, 2009 WL 1689660, **2-3 (E.D. Mich. June 16, 2009) (analyzing the *Panak* factors and denying suppression of statements made at police station).

Indeed, under the totality of the circumstances, the questioning was, on balance, not custodial in nature. According to testimony from Allen and East, Defendant voluntarily accompanied the officers to the police station in order to answer further questions. *See* DE #16 Tr., at 42-43. The officers did not brandish their respective weapons or engage in any other threatening or forceful actions. *See id.* at 33. Defendant was never frisked or searched and remained unrestrained throughout the transportation to and questioning at the police station. *See id.* at 23-24. Additionally, the officers testified that they informed Gay that he did not have to answer any questions and was

---

[2] Gay does not suggest that the initial encounter with law enforcement – which took place at the hospital – approached custody. *See* DE #16 Tr., at 18-22 (discussing initial approach by Allen and later by East); *id.* at 7 (defense counsel agreeing that a similar scenario of police approaching a person in a parking lot and asking a few question "is not subject to Miranda").

free to leave the station at any time. *See id.* at 46; *id.* at 29 (Q: "Was he free to walk out of the police car?"; A: "We would have let him out, if that's what he wanted."). The officers told Defendant that they would "bring [him] back up" to the hospital at the conclusion of questioning at the station. *See id.* at 42-43. Gay also maintained possession of his personal effects, *e.g.*, heart medication, which the officers would have seized if he had been under formal arrest. *See id.* at 24. Taken together, these circumstances would not have led a reasonable man in Defendant's position to believe he was in custody.

The video recording of the interview, which the Court admitted into evidence at the hearing, bolsters the officers' testimony. A review[3] of the available video shows that Defendant was clearly at ease during the questioning. Upon Gay's request, Officer Allen promptly provided him with a glass of water. The video also shows that the questioning proceeded as a conversation rather than a series of mumbled or monosyllabic responses by Gay to officer questions. The video demonstrates a non-custodial environment, in which *Miranda* does not apply.

Further, on the video, the officers plainly provided full *Miranda* advice and expressly told Gay that he was free to leave. The transportation issue was, per the only testimony, just a matter of convenience. Gay felt comfortable enough to, on more than one occasion, pat the shoulder of one of the officers. *See* DVD: Jan. 29 Station Questioning (Hazard P.D. 2009), at 33:37-33:43; *id.* at 33:57-34:00; *id.* at 48:14. He did not evince characteristics of stress, compulsion, or restraint.

---

[3]

During the hearing, the United States sought to admit only a portion of the DVD recording of the January 29 interview. *See* DE #16 Tr., at 59. Defendant requested admission of the entire DVD, but made no argument based on the entirety of the DVD. *See id.* In chambers, the Court reviewed nearly one hour of footage before the recording froze. Repeated attempts to review the recording in its entirety ended with the same result. Because neither party's argument rests on the full recording, the Court did not (and will not) request a replacement DVD, but alerts the parties to the limitations of the admitted DVD.

If Gay was not questioned in custody, then *Miranda* does not apply. *See Miranda*, 86 S. Ct. at 1630. Here, the questioning was noncustodial, and *Miranda* offers no remedy.

2. *Miranda* Waiver

Because Defendant has not proved that he was in custody for purposes of *Miranda*, the issue of waiver is moot. However, if Gay had been subject to custodial interrogation, the United States would have failed, on this record, to prove that Defendant properly waived his *Miranda* rights.

A person may properly waive *Miranda* rights "provided the waiver is made voluntarily, knowingly, and intelligently." *See Miranda*, 86 S. Ct. at 1612. Thus, a waiver inquiry has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*See Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1986) (quoting *Fare v. Michael C.*, 99 S. Ct. 2560, 2572 (1979)); *see also North Carolina v. Butler*, 99 S. Ct. 1755, 1758 (1979) ("[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'") (quoting *Johnson v. Zerbst*, 58 S. Ct. 1019, 1023 (1938)). The United States bears the "*great*" burden of proving waiver, and "[t]he courts must presume that a defendant did not waive his rights[.]" *See Butler*, 99 S. Ct. at 1757 (emphasis added); *Miranda*, 86 S. Ct. at 1628 ("If the interrogation continues without the presence of an attorney and a statement is taken, a *heavy burden* rests on the government to demonstrate that the defendant knowingly and intelligently waived his [rights].") (emphasis added). When assessing

waiver, a court can consider, as a factor, a defendant's refusal to sign a written waiver; such refusal is not, however, determinative. *See Butler*, 99 S. Ct. at 1757 ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.").

On this record, the United States cannot show that Defendant clearly demonstrated "the requisite level of comprehension" of both the nature and consequences of abandoning his *Miranda* rights. Both Officer Allen and Captain East testified that Defendant refused to waive his rights at the beginning of the interview. In fact, the DVD recording of the interview shows that Gay adamantly and repeatedly refused both oral and written waiver. When Captain East sought oral waiver, Defendant stated that he would speak with the officers but could not waive his *Miranda* rights. *See* DVD: Jan. 29 Station Questioning (Hazard P.D. 2009), at 5:21-5:36 (EAST: "Do you hereby waive those rights to where you'll talk to us?" GAY: "You can't waive your rights." EAST: "Do you mind talking to us?" GAY: "No." EAST: "You don't mind talking to us?" GAY: "No, but you cannot waive your rights. I learned that when I taught law enforcement."). Captain East then placed a waiver form in front of Defendant and asked if Gay would sign the document. After reading the form, Defendant refused to sign, and the following exchange between Defendant and Captain East occurred:

> CAPTAIN EAST: "Jimmy, if you wouldn't mind, sign your name right there."
>
> DEFENDANT GAY: "That's the same thing. I don't need to sign it, do I?"
>
> CAPTAIN EAST: "You don't have to sign it if you don't want to."
>
> DEFENDANT GAY: "'Cause **I'm not gonna waive** my rights."
>
> CAPTAIN EAST: "Okay."

9

>DEFENDANT GAY: "You can't, you can't give up on your rights."
>
>CAPTAIN EAST: "All we're asking is do you understand the rights . . ."
>
>DEFENDANT GAY: (interrupting) "Yeah, I understand."
>
>CAPTAIN EAST: "If you understand your rights, and do you mind talking to us?"
>
>DEFENDANT GAY: "I said, No."
>
>CAPTAIN EAST: "Okay, and you're not going to sign the waiver?"
>
>DEFENDANT GAY: (Shaking head "no") "You can't waive your rights. That's what I'm telling you. You cannot waive your rights."

*See id.* at 5:50-6:24 (emphasis added). Defendant also asked that East include with his notation of "refused signature" Defendant's reason for refusal: "Because you cannot waive your rights." *See id.* at 6:30-6:31.

Admittedly, the record shows that Gay has some (albeit not definitively articulated) experience with teaching law enforcement, *see* DE #16 Tr., at 49, and, per the DVD recording, Gay repeatedly indicated that he knew his rights. However, Defendant's repeated and increasingly emphatic assertion that he could not – and would not – waive his rights leads the Court to conclude that, at best, Gay did not comprehend fully "the nature of the right being abandoned and the consequences of the decision to abandon it." Gay's statement that he would talk but expressly would not waive his rights plainly shows that he did not understand or comprehend the gravity of speaking. If he had an operative right at that moment, which custodial interrogation would trigger, he did not knowingly and intelligently give up that right. *See, e.g., Connecticut v. Barrett*, 107 S. Ct. 828, 834 (1987) (Brennan, J., concurring in judgment) (agreeing that waiver was valid per the defendant's trial testimony that he understood his rights but also opining generally, and citing *Butler*,

99 S. Ct. at 1759, "that this odd juxtaposition (a willingness to talk and an unwillingness to have anything preserved) militates against finding a knowing or intelligent waiver of the right to silence").

In making this finding, the Court is persuaded by a similar case from a federal district court in the state of Washington. In *United States v. Fabel*, the district court evaluated a scenario involving a defendant who voluntarily traveled to a police station to answer questions. *See Fabel*, No. CR06-041L, 2007 WL 675945, at *1 (W.D. Wash. Feb. 1, 2007). Before questioning the defendant, the police officer informed him of his *Miranda* rights and asked him to sign a waiver "acknowledging [that his] constitutional rights have been read to [him]." *See id.* The defendant signed the waiver form once the officer told him that his signature did not indicate the defendant's guilt, but rather meant he "underst[oo]d everything and . . . [was] willing to talk" to the officers. *See id.* at *2. Subsequently, the defendant, "[o]n at least three occasions after signing his *Miranda* waiver, but prior to the start of the interrogation, . . . informed the officers that he was not waiving his constitutional rights." *See id.* at *3; *id.* at *2 ("I'm not gonna waive my constitutional rights in case this goes to court. . . . Then I'm not gonna have a ground to stand on."). Despite these assertions, the police continued the questioning without further clarification or discussion "as if [the defendant] had waived all his *Miranda* rights without reservation." *See id.* at *3. Having examined these circumstances, the district court suppressed the statements, finding that the defendant "believed he was making an 'off the record' statement" rather than knowingly and intelligently waiving his rights; thus, the court suppressed the defendant's statements. *See id.*

Like the defendant in *Fabel*, Defendant stated multiple times, prior to any police questioning, that he would not waive his rights. Gay then went one step further and refused to sign a written

11

waiver, requesting that East explicitly note on the form that Defendant refused to sign because he could not waive his rights. Instead of clarifying Gay's statements of refusal to waive, the officers questioned Defendant as if he "had waived all his *Miranda* rights without reservation." In short, if Gay had been subjected to custodial interrogation, his purported waiver would not have been knowing and intelligent, and thus would have been invalid.

3. Fifth Amendment/Due Process Analysis

Even when *Miranda* does not apply, confessions and incriminating statements still, to be admissible, must be voluntary under the Fifth Amendment Due Process Clause. *See*, *e.g.*, *Beckwith v. United States*, 96 S.Ct. 1612, 1617 (1976) (recognizing that "*noncustodial* interrogation might possibly in some situations, by virtue of some special circumstances . . . bring about confessions not freely self-determined," and explaining that "voluntariness" is the key issue "[w]hen such a claim is raised") (emphasis added).

The due process test for voluntariness examines "whether a defendant's will was overborne." *See Dickerson v. United States*, 120 S. Ct. 2326, 2331 (2000) (citations omitted). The test takes into consideration the "totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." *See id*. (citations omitted). Whether the suspect received or did not receive *Miranda* warnings is only a factor under this analysis. *See Beckwith*, 96 S. Ct. at 1617 ("Proof that some kind of [*Miranda*] warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive."); *Jackson v. McKee*, 525 F.3d 430, 433-34 (6th Cir. 2008) (noting a "spectrum of factors" to include suspect's age, education, and intelligence, receipt of *Miranda* warnings, length of questioning, and use of physical punishment).

12

The Sixth Circuit breaks the due process test for voluntariness into three queries: 1) Was the police activity "objectively coercive"? 2) Was the coercion in question "sufficient to overbear the defendant's will"? and 3) Was the alleged police misconduct "the crucial motivating factor" in the defendant's decision to offer the challenged statement? *See United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003).

Here, the Court's determination that the interview was noncustodial establishes the absence of constitutionally significant coercion or restraint. The Supreme Court very narrowly allowed in *Beckwith* that a "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances" produce an involuntary confession. *See Beckwith*, 96 S.Ct. at 1617. No such "special circumstances" surrounded the January 29 questioning. To reiterate, the officers did not brandish their weapons or engage in any other type of force. Additionally, the officers did not restrain Defendant at any time in transit to the police station or during questioning. Defendant was not frisked or searched, and he maintained possession of his personal effects, including his heart medication. Per the DVD recording, the questioning was not accusatory or overbearing, but rather conversational in nature. Thus, the record does not provide any evidence that the police overrode Gay's will or in any way engaged in misconduct; Defendant's statements were voluntary under the Fifth Amendment Due Process Clause.

**III. Fourth Amendment Analysis**

1. Probable Cause/Four-Corners Analysis

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *See* U.S. CONST., amend. IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere

13

suspicion." *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *See United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (en banc) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). A supporting affidavit must demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *See United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).

When evaluating whether a warrant application presented probable cause, a reviewing court must accord "great deference" to the issuing magistrate's determination. *See United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). Such deference ensures that "an issuing magistrate's discretion [will] only be reversed if it was arbitrarily exercised." *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). The reviewing court will uphold the issuing magistrate's probable cause determination so long as a "substantial basis" existed for the judge to conclude "that a search would uncover evidence of wrongdoing." *See Illinois v. Gates*, 103 S.Ct. 2317, 2331 (1983); *Allen*, 211 F.3d at 973.

Line-by-line scrutiny of the supporting affidavit is inappropriate. *See Allen*, 211 F.3d at 973. Further, the reviewing court must limit its review for a "substantial basis" to "information presented in the four corners of the affidavit." *See United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006); *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). Additionally, when the search at issue occurred pursuant to a warrant, the defendant "has the burden of making a prima facie case that the search was illegal." *See United States v. Franklin*, 284 F. App'x 266, 275 (6th Cir. 2008) (citing

14

*United States v. Murrie*, 534 F.2d 695, 697-98 (6th Cir. 1976)).

Here, information contained in the four corners of the affidavit provided a "fair probability" that contraband or evidence would appear on Defendant's premises, and thus a substantial basis for warrant issuance. The warrant applied to the particularized "personal property," most notably computer equipment, at a defined and specific location, as described in the application. The supporting affidavit included the following information:

    a. Defendant admitted that he had approached the juvenile boy in the hospital, spoken with him, and taken several photographs of him using a phone camera.

    b. The phone held photos of the juvenile as well as several other "male juveniles walking into Wal-Mart."

    c. Gay indicated that he had downloaded information on his computer including nude pictures of "young" boys, some of whom may be juveniles. Defendant also stated that he had received emails containing photos of "nude boys."

    d. Gay informed the officers that he had CDs with hundreds of photographs.

Taken together, these statements constitute a reasonable basis for believing that the computer would contain contraband or evidence of a crime.[4]

During the hearing, Defendant's counsel attempted to make an argument for striking information from the affidavit due to the officers' "quantum leap" from questions concerning the photographs on Gay's cell phone to questions concerning the contents of Gay's home computer. *See* DE #16 Tr., at 6; *id.* at 72; *see also* DE #12-2 Supporting Memorandum, at 1 ("The Defendant asserts that the law enforcement proceeded to unlawfully question the Defendant without probable

---

[4] Of course, Gay sought to exclude much of this basis via the *Miranda* argument. The Court excludes none of the affidavit per its resolution of that argument. The United States concedes that the warrant would fail without Gay's statements. *See* DE #13-2 U.S. Response Memorandum, at 7.

cause, about the contents of his personal computer. At the time of questioning, the investigating officers had no reason to believe that anything inappropriate would be on the Defendant's computer."). This argument is without merit. As previously noted, Defendant's explanation that some of the photographs on his cell phone were "pictures of pictures" taken from the Internet led directly to the officers' follow-up questions concerning the contents of Gay's computer. More significantly, law enforcement officers need not disclose the subject matter of official questioning. *See Colorado v. Spring*, 107 S. Ct. 851, 858 (1987) ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today."). As noted above, Defendant's noncustodial statements were voluntary under the Fifth Amendment, and any questions asked about Gay's computer use and contents were not coercive or the product of "official trickery." *See id.* Per a four-corners analysis, the issuing judge had a "substantial basis" for finding probable cause. The search was proper under the Fourth Amendment.

2. *Leon* Good Faith

Even if probable cause did not exist, *Leon* unquestionably would spare the search. Absent probable cause, evidence otherwise subject to suppression may survive the exclusionary rule under the *Leon* good faith exception. In *United States v. Leon*, 104 S. Ct. 3405 (1984), the Supreme Court held that the exclusionary rule does not bar evidence seized in reasonable, good-faith reliance on a search warrant subsequently determined to be invalid. *See Leon*, 104 S. Ct. at 3415; *United States v. Leake*, 998 F.2d 1359, 1366 (6th Cir. 1993). In such cases, application of the exclusionary rule would yield no additional deterrent effect, given that the officer's reliance on the warrant was *objectively* reasonable. *See United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006). A

reviewing court, therefore, must determine whether the supporting affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *See Leon*, 104 S. Ct. at 3421 (citation omitted); *see also United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (noting that this standard, by definition, "is a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place.")

Having created the good-faith exception, the Supreme Court enumerated four situations in which the exception would not apply: 1) where the affiant provided false information to the issuing judge and knew or should have known about the falsity; 2) "where the issuing magistrate wholly abandoned his judicial role"; 3) where the supporting affidavit is devoid of "indicia of probable cause"; and 4) where the warrant is "so facially deficient" that the "executing officers cannot reasonably presume it to be valid." *See Leon*, 104 S. Ct. at 3421 (citations omitted); *see also United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (reciting the standard).

As detailed above, the supporting affidavit provided sufficient "indicia of probable cause" to permit a reasonable officer to rely on the warrant to search Defendant's residence and seize computer equipment and related materials. Furthermore, Defendant has provided no argument invoking any of the four situations precluding application of the *Leon* exception. Therefore, and based on the *Miranda* resolution, even if the warrant lacked probable cause, the items seized would be admissible pursuant to the good faith exception.

**IV. Conclusion**

For the reasons discussed, the Court recommends that the District Court DENY the Motion to Suppress.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this

recommendation, issued under subsection (B) of that statute. As defined by § 636(b)(1) and Fed. R. Crim. P. 59(b), within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 16th day of September, 2009.

Signed By:
Robert E. Wier  REW
United States Magistrate Judge